UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TIFFANY McMILLAN and VELIA MORRIS,      :
                                        :
                              Plaintiffs, :      10 Civ. 2296 (PAC)
            - against -                 :
                                        :      OPINION & ORDER
City of New York,                       :
New York City Police Department, Police Officer :
ALICJA SZABRANSKA, In her Individual and :
Official Capacity, Police Officer PAUL  :
CHIERCO, In his Individual and Personal :
Capacity, Police Officer ANTHONY LEPORE, :
In his Individual and Official Capacity, :
and Police Officer AJAY BHUVANESHWAY,   :
In his Individual and Official Capacity, :
                                        :
                              Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 9, 2011

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs Tiffany McMillan and Velia Morris filed their complaint on March 15, 2010

alleging that New York City Police Officers Alicja Szabranska, Paul Chierco, (sued herein as

"Paul Chierco"), Anthony Lepore, and Ajay Bhuvaneshway (the "Officer Defendants") used

excessive force against them while arresting McMillan on March 18, 2007.  Plaintiffs assert

claims under 42 U.S.C. §§ 1981, 1983, 1985, as well as state common law claims.[1]  On June 6,

2011, the City of New York, the New York City Police Department, and the Officer Defendants

(collectively, the "Defendants") moved for summary judgment on all of Plaintiffs' claims.  For

the reasons discussed below, the Court grants Defendants' motion for summary judgment.

---

[1] At oral argument, Plaintiffs stipulated to dismissing with prejudice their claims under the First and Fourteenth
Amendment; claims for conspiracy; failure to intervene; deliberate indifference Monell claim; as well as Plaintiffs'
state law claims.  Plaintiffs also stipulated to dismissing the City of New York and the New York City Police
Department as defendants in this case.  (See Stipulation and Order, Dec. 5, 2011, Doc. No. 32.)  Accordingly, the
only issue remaining in this case is Plaintiffs' § 1983 claim of excessive force against the Officer Defendants.

# BACKGROUND[2]

On Sunday evening, March 18, 2007, Plaintiff Tiffany McMillan went to a restaurant with several friends and drank two Long Island iced teas[3] with dinner.  (Defs' 56.1 at ¶¶ 3-4.) Between 8:30 and 9 p.m., McMillan returned to her apartment at 212-29 Hillside Avenue, Apartment 4EW, Queens Village, New York 11242 ("Apartment 4EW"), where she lived with her grandmother, Plaintiff Veila Morris, and McMillan's four-year-old daughter, H.M.  (Id. at ¶¶ 1, 5.)  McMillan's mother, Angela Uvino, resided in Apartment 3MW at the same address with her then eight-year-old daughter, N.U. (McMillan's sister).

When McMillan arrived home, Morris told her that H.M. was in Uvino's apartment. McMillan went downstairs to Apartment 3MW and told Uvino that H.M. had school the next morning and needed to go upstairs to bed.  (Id. at ¶ 8.)  Uvino refused to let McMillan take H.M. back to Apartment 4EW.  After McMillan insisted, an argument followed, leading to an altercation between McMillan and Uvino.  (Id. at ¶¶ 8-9.)  McMillan testified that she "just kind of pushed" Uvino, tripped over a step inside the doorway, and then fell with Uvino onto a table. (Id. ¶ 9; McMillan Dep. at 148:13-14.)  When N.U. attempted to intervene, McMillan "tried to push her out of the way so we wouldn't fall on her."  (McMillan Dep. at 148:15-16.)  McMillan

---

[2] For purposes of Defendants' motion for summary judgment, the Court accepts facts undisputed as true as set forth in Defendants' Statement Pursuant to Local Rule 56.1.  Rather than comply with Local Rule 56.1, which requires the nonmoving party to respond with objections to the moving party's 56.1 statement, McMillan and Morris filed their own 56.1 statement.  As a result, the Court may deem Defendants' statement of material facts admitted for purposes of this motion.  L. Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

[3] The Court notes that a Long Island Iced Tea is a strong cocktail that commonly contains equal parts of vodka, tequila, rum, and gin, plus soda.  Sometimes crème de menthe and brandy are added to this intoxicating mix.

then "grabbed H.M." and returned to Apartment 4EW.  (Id. at 148:17-19.)  As soon as McMillan

left, Uvino called 911 and reported an assault.  (Def's 56.1 ¶ 13, Ex. O.)

Officers Chierico and Lepore responded to a radio run reporting an assault in progress at

Uvino's apartment.  (Defs' 56.1 ¶ 14.)  When they arrived at Apartment 3MW, Uvino told the

officers that she was babysitting her granddaughter, and when her daughter returned they had an

argument that developed into an altercation.  (Lepore Dep. at 22:6-9.)  Uvino showed Officers

Chierico and Lepore injuries to her neck and claimed that McMillan caused them.  (Lepore Dep.

at 22:19-21.)  The officers also observed that N.U. was injured.  Both Uvino and N.U. stated that

McMillan caused these injuries.  (Id. at 22:23-25, 25:7-19 ("She said her sister hurt her.").)[4]

Uvino advised Officers Chierico and Lepore that McMillan lived upstairs in Apartment 4EW.

The officers left Uvino's apartment and proceeded to the fourth floor.  (Lepore Dep. at 27:5-7,

12-18.)[5]

Officers Chierico and Lepore arrived at Apartment 4EW and knocked on the door.  The

parties offer different versions of the events that followed.  Officer Lepore testified that a female

asked who was at the door.  He and Officer Chierico then identified themselves as police and

asked to speak to "Tiffany."  (Lepore Dep. at 30:5-20.)  According to Officer Chierico,

McMillan opened the door and gave no response when Officer Chierico asked her to identify

herself.  (Chierico Dep. at 25:4-24.)  Officer Chierico testified that he was "positioned halfway

---

[4] Uvino wrote a supporting sworn deposition to a domestic incident report after speaking with Officers Chierico and
Lepore.  Her account differs somewhat from McMillan's version of their altercation.  Uvino states that McMillan
"entered my apartment, she verbally [sic] and choked me (Angela Uvino), pushed her sister (punched), she choked
her mother and punched her sister . . . ."  (Declaration of Michael K. Gertzer ("Gertzer Decl.") at Ex. K.)

[5] Officer Chierico testified that he and Officer Lepore went to Apartment 4EW intending to make a lawful arrest of
McMillan.  (Chierico Dep. at 22:5-8, 22:23-23:6.)  According to Officer Lepore, the remaining Officer Defendants
had not yet arrived on the scene at that point.  (Lepore Dep. at 27:19-22.)

in, halfway out[side Apartment 4EW] while [he] was communicating with Tiffany initially." (Id. at 29:2-4.) McMillan then gave her name and shut the door. (Id. at 26:5-8.) Morris then reopened the door and asked what the officers wanted with her granddaughter. (Chierico Dep. at 40:21-23; Lepore Dep. 45:10-21.) McMillan attempted to shut the door in an "aggressive" manner, but Officer Chierico used his foot to block the door from closing. (Lepore Dep. 50:13-18, 51:3-5.) According to Officer Lepore, McMillan then "charge[d] out the door. . . . Explode[d] . . . ." (Lepore Dep. 52:9-13; see also Chierico Dep. at 42:10-11 ("[P]retty much simultaneously, Tiffany McMillan rushed out of the apartment.").) McMillan attempted to push past the officers and run into the hallway toward the stairwell. (Lepore Dep. at 58:7-14.) Officer Chierico testified that "[w]hen she ran out, she struck me to my upper body with a closed or possibly partially closed fist while flailing her arms and making herself pass myself and Officer Lepore." (Chierico Dep. at 51:7-11.) The officers attempted to handcuff McMillan at that point but were unsuccessful. (Lepore Dep. at 60:4-24 ("She was flailing her arms and trying to flee.").)

During these events, Officers Bhuvaneshway and Alex Kruk arrived at Uvino's apartment in response to the radio run. After speaking with Uvino in Apartment 3MW, they went to the fourth floor. (Defs' 56.1 ¶ 32.) Officer Bhuvaneshway testified that he heard "a loud commotion" in front of Apartment 4EW and observed Officer Chierico with "his foot inside the door to prevent it from closing . . . ." (Bhuvaneshway Dep. at 21:4-6, 25:2-4.) After McMillan broke free from Officers Chierico and Lepore, she attempted to run down the hall and ran into Officer Bhuvaneshway, who grabbed her by her arm and placed her in one handcuff. (Bhuvaneshway Dep. at 38:12-23, 39:10-14.) McMillan's remaining arm was flailing, and Officers Chierico, Lepore, and Bhuvaneshway struggled to restrain her. (Id. at 43:13-44:7;

Lepore Dep. at 65:4-11.)  As they struggled to handcuff McMillan, the officers[6] lost their footing

and fell to the floor with McMillan.  (Bhuvaneshway Dep. at 44:9-17; Chierico Dep. at 57:2-4

("[W]hile assisting, being that that [sic] she was very irate, aggressive, we ended up falling to the

ground.")   Officer Bhuvaneshway testified that he and McMillan both fell face first onto the

floor.  (Bhuvaneshway Dep. at 54:21-25.)  Officers Bhuvaneshway, Chierico and Lepore each

received injuries as a result of this fall.  (Gertzer Decl. Exs. H, I, J.)[7]  Once on the floor,

McMillan bit Chierico on his right hand between his thumb and forefinger.  (Id. Ex. I at NYC

169.)

At this time, Officers Szabranska and Salice responded to the scene because the four

other officers had not answered their sergeant's radio calls.  (Szabranska Dep. at 14:18-25.)

Officer Szabranska arrived after McMillan was already on the floor, and recalled that one of the

officers was "holding [McMillan's] legs, because she was kicking."  (Id. at 17:22-24, 20:3-4

(stating that McMillan was "kicking, waving her hands, basically resisting arrest").)  She

testified that she "wasn't even close to [McMillan]" and was "pretty sure" that none of the

officers hit McMillan with their fists.  (Id. at 22:9-17.)

Officer Szabranska also observed Morris in the doorway of Apartment 4EW "yelling and

screaming," which made McMillan "more aggressive [and] more combative."  (Id. at 24:16-20,

---

[6] Although Officer Bhuvaneshway testified that Officer Kruk attempted to grab McMillan in order to place her in handcuffs, Officers Lepore and Chierico testified that Officer Kruk did not assist in the effort to restrain McMillan. (Bhuvaneshway Dep. at 43:9-13; Chierico Dep. at 56:3-11; Lepore Dep. at 65:12-16.)

[7] Officer Lepore strained his right shoulder and elbow in the fall, and Officer Chierico sprained his wrist.  (Defs' 56.1 ¶¶ 45-46.)  Officer Bhuvaneshway suffered torn ligaments as a result of McMillan landing on his wrist during the fall.  (Id. at ¶ 40, Ex. H.)  As a result of his injuries, Officer Bhuvaneshway was first placed on restricted duty and ultimately retired from the NYPD.  (Id. at ¶ 40.)  At oral argument, counsel for McMillan argued that prior wrist injuries aggravated Bhuvaneshway's condition.

25:8-14, 26:5-8.)  Officer Szabranska testified that she asked Morris "numerous times to go

inside [Apartment 4EW], because it seem[ed] like her being—her being there would make things

worse, 'cause [sic] her yelling and crying, like I said, was making Miss McMil' [sic] like more

upset."  (<u>Id.</u> at 26:21-25.)  Officer Szabranska denies Morris's allegations that she pushed her

police baton into Morris's left shoulder and maintains that she did not have her police baton with

her when she responded to the radio run that night.  (Szabranska Dep. at 27:16-22, 29:18-21.)

    Plaintiffs present a different version of events.  McMillan testified that when she opened

the door to Apartment 4EW, she saw "at least five" uniformed officers, one of whom she

believed was a woman.  (McMillan Dep. at 172:2-6, 19-24.)[8]  McMillan testified that she offered

to assist them but that the officers refused to tell her why they were there; "[t]hey wouldn't even

tell me who they were looking for."  (<u>Id.</u> at 175:6-15.)  According to McMillan, she told the

officers that she was "not decent to be standing and talking amongst men, not dressed," and that

she needed to get a coat and shoes before going outside to speak with them.  (<u>Id.</u> at 173:14-18.)

She testified that during this exchange one of the officers "wedged his foot into the door because

I had the door knob in my hand."  (<u>Id.</u> at 173:9-11.)

    McMillan contends that she then "got pulled out my house, [sic] my head got slammed

against the door.  And before I knew it, I was on the ground trying to cover my face."  (<u>Id.</u> at

173:19-21.)  She testified that she "just kept getting hit" and remembered "a man and a ring, a

ring on his finger that kept hitting me in a face [sic]" over "20 or 30 times."  (<u>Id.</u> 173:22-24,

---

[8] McMillan subsequently stated that there "could be two, . . . could be one [officer]" who had asked her to identify
herself.  (McMillan Dep. at 174: 13-17.)

186:5-9.)  She speculates that she was "probably" kicked as well.[9]  McMillan contends that the Officer Defendants intentionally pulled her out of Apartment 4EW in order to slam her head against the wall, but has "no idea" why they would have done so.  (Id. at 182:11-22.)

Morris testified that when she opened her door, the officers "had Tiffany on the floor, beating her face" and that a female officer "had her legs up . . . on the back of [McMillan], hitting her with the stick . . . ."  (Morris Dep. at 46:23-25.)  Morris "scream[ed] for Jehovah God" because she "was excited" and feared that the Officer Defendants would "kill" McMillan.  (Id. at 49:24-25, 60:4-5.)[10]  She testified that Officer Szabranska ordered her to return to her apartment and injured her left arm by pushing her back into Apartment 4EW with a police stick.[11]  (Id. at 46:2-14.)  Morris described the stick as "medium size, it wasn't so thick, it wasn't so thin, it was just an ordinary stick."  (Id. at 66:15-16.)  According to Morris, Officer Szabranska "took the stick and she threw me here [indicating left shoulder] and she pushed me in the door, she said, 'You have nothing to do with this.  You go inside.'"  (Id. at 46:7-10.)  Morris estimated that she was "about four feet" away from McMillan and the other Officer Defendants when Officer Szabranska pressed a police stick against Morris's left shoulder.  (Id. at 65:18-20.)  Morris testified that she developed a bruise "like the size of a 50 cents or bigger."  (Id. at 11:10-

---

[9] McMillan testified that she "probably" was kicked during the course of her arrest "[b]ecause for somebody to beat up – for men to beat on women to that extent, if you would do that to somebody's face, why wouldn't you kick them."  (McMillan Dep. at 187:4-8.)  When asked if she knew if she recalled whether someone kicked her, she replied, "I don't know if someone kicked me."  (Id. at 9-11.)

[10] As Morris testified:  "I was excited, I was frightened.  I was more frightened, because policemens [sic] kill you, policemens [sic] are – I mean, you know what a policeman is like?  They will kill you, they will shoot you and they don't care."  (Morris Dep. 60:4-7.)

[11] McMillan testified that she never saw a police officer push Morris.  (McMillan Dep. at 194:9-13.)

12.)  She went to the doctor a few days after the incident and was told to apply heat and take aspirin.  (Morris Dep. at 10:3-10.)

After McMillan was placed in handcuffs, the officers walked her to a police car.  (Defs' 56.1 ¶ 59.)  McMillan was taken by ambulance to Queens Hospital Center for her injuries.  EMS records indicate that McMillan had "lac[eration] above left eyebrow"; that she complained of "pain & ringing to [left] ear" and pain to her nose; and that she had "edema to [left] top lip." (Defs' 56.1 ¶ 64, Ex. F at NYC 144.)  Officer Szabranska testified that McMillan "was so drunk, and it was almost impossible even to hold her still in the ambulance.  She was strapped in by EMS, and she was giving them such a hard time . . . .  We didn't think we were going to make it to the hospital, because she was very combative.  She was cursing."  (Szabranska Dep. at 73:11-19.)  EMS records also state that McMillan "became verbally abusive towards EMS and [police] en route to [the hospital]."  (Defs' 56.1 ¶ 64, Ex. F at NYC 144.)

At the hospital, McMillan was taken to the emergency room.  ER personnel noted that McMillan had "swelling [and] laceration to [left] eyebrow."  (Id. at NYC 146.)  Her medical chart indicates "no evidence of trauma" in her extremities, and a CT scan of McMillan's head revealed "soft tissue swelling no intracranial hemorrhage."  (Id., Ex. F at NYC 149.)  She was diagnosed with a head contusion, received stitches for her laceration and was prescribed Motrin for pain.  (Id. at NYC 145, 149.)

McMillan was charged with three counts of assault in the second degree, five counts of assault in the fifth degree, one count of resisting arrest, one count of endangering the welfare of a child, and five counts of harassment in the second degree.  (Defs' 56.1 ¶ 65, Ex. R.)  On January 20, 2009, McMillan pleaded guilty to resisting arrest and one count of assault in the second

degree.  This assault charge was to be dismissed upon McMillan's completion of a 24-week program of either anger management or alcohol treatment.  (<u>Id.</u> ¶ 66, Ex. L at 2-3.)  In her plea allocution, McMillan stated:  "When I resisted arrest and fell to the ground another officer was injured."  (<u>Id.</u>, Ex. L at 7.)

The NYPD Civilian Complaint Review Board ("CCRB") and Internal Affairs Bureau ("IAB") each conducted an investigation into the Plaintiffs' allegations of excessive force and concluded that they were unwarranted.  (<u>See</u> Gertzer Decl. Ex. N.)

<b><u>DISCUSSION</u></b>

**A.  Standard of Review**

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  <u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir.1995).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory

allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc.,

315 F.3d 171, 175 (2d Cir.2003) (internal citations and quotations omitted), but must instead

present specific evidence in support of its contention that there is a genuine dispute as to material

facts.  Fed. R. Civ. P. 56(e).  The court resolves all ambiguities and draws all factual inferences

in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts."  Scott v.

Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).  "[W]here the record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

issue for trial.'"  Id.

## B.  § 1983 Claim for Excessive Force

To establish liability under § 1983, a plaintiff must show that (1) the defendant acted

under color of state law; and (2) the defendant's actions deprived plaintiff of rights, privileges, or

immunities guaranteed by the Constitution.  Washington v. County of Rockland, 373 F.3d 310,

315 (2d Cir. 2004).  There is no dispute that the Officer Defendants were acting under color of

state law.  The only question is whether the manner in which they arrested McMillan and acted

with respect to Morris deprived Plaintiffs of their rights under the Fourth Amendment.

The Fourth Amendment's guarantee of the right against unreasonable seizure prohibits

the excessive use of force in the course of an arrest or other seizure.[12]  Graham v. Connor, 490

---

[12] Plaintiffs were each "seized" for purposes of the Fourth Amendment; but the Court rejects any suggestion that
McMillan's arrest was unlawful because the police did not have a warrant.  Although they did not have an arrest
warrant for McMillan, exigent circumstances were present here to justify any minimal invasion into McMillan's
apartment.  See Loria v. Gorman, 306 F.3d 1271, 1283 (2d Cir. 2002) ("[P]olice officers need either a warrant or
probable cause plus exigent circumstances in order to make a lawful entry into a home.") (internal quotation
omitted).  Whether exigent circumstances exist depends on the totality of the circumstances.  Id. at 1284.  Exigent
circumstances are more likely to exist, however, where law enforcement agents "were confronted by an urgent need
to render aid or take action," or where the crime was violent.  Id. at 1284, 1286.  Courts also recognize "the
combustible nature of domestic disputes, and have accorded greater latitude to an officer's belief that a warrantless

U.S. 386, 394 (1989).  A court must analyze claims of excessive force under the Fourth

Amendment's "objective reasonableness" standard.  Scott, 550 U.S. at 381 (citing Graham, 490

U.S. at 388).  To establish that an officer's use of force was unreasonable and a violation of the

Fourth Amendment, a plaintiff must show "that the government interests at stake were

outweighed by 'the nature and quality of the intrusion on [plaintiff's] Fourth Amendment

interests.'"  Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (quoting

Graham, 490 U.S. at 396).

Although the circumstances of an arrest may justify an officer in using some degree of

force, "an officer is not entitled to use an unlimited amount of force, even where the arrestee

resists or assaults the officer."  Garcia v. Greco, No. 05 Civ. 9587(SCR) (JFK), 2010 WL

446446, at *4 (S.D.N.Y. Feb. 9, 2010).  "The force used by the officer must be reasonably

related to the nature of the resistance and the force used, threatened, or reasonably perceived to

be threatened, against the officer."  Sullivan v. Gagnier, 225 F.3d 161, 166 (2d Cir. 2000).  The

inquiry "requires careful attention to the facts and circumstances of each particular case,

including the severity of the crime at issue, whether the suspect poses an immediate threat to the

---

entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties
to the dispute was in danger."  Tierney v. Davidson, 133 F.3d 189, 197 (2d Cir. 1998).  Here, the police were
lawfully on the premises when they arrived on the scene in response to Uvino's 911 call reporting an assault.  They
observed bruises on Uvino and N.U., which both said were inflicted by McMillan during the altercation that
McMillan caused and which she concedes took place.  Uvino advised the officers that McMillan was in the
apartment directly upstairs and that a small child was present.  The officers proceeded to Apartment 4EW and asked
for Tiffany.  They could not know whether she planned to return to Apartment 3MW and continue her assault on her
mother and 8 year-old sister.  The late hour of the Sunday evening made obtaining an arrest warrant impractical.
The officers had a reasonable belief that Uvino and N.U. were still in danger; it was permissible under the Fourth
Amendment for the officers to arrest McMillan in her doorway without an arrest warrant.  See Tierney, 133 F.3d at
197 (finding exigent circumstances present where officer responded to what he was told was a "bad" domestic
disturbance that ended shortly before his arrival and where he reasonably believed that both antagonists remained in
the house).  Indeed, it might have been dereliction of duty not to proceed as the officers did.  Any attempt by the
officers to obtain McMillan's side of the story was frustrated by her own conduct at her apartment.

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight."  <u>Graham</u>, 490 U.S. at 396.  In assessing an excessive force claim, a court should

evaluate the record "from the perspective of a reasonable officer on the scene, rather than with

the 20/20 vision of hindsight."  <u>Tracy v. Freshwater</u>, 623 F.3d 90, 96 (2d Cir. 2010) (internal

quotation omitted).

"Because of the fact-specific nature of the inquiry, granting summary judgment against a

plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could

conclude that the officers' conduct was objectively unreasonable."  <u>Barlow v. Male Geneva</u>

<u>Police Officer who Arrested me on January 2005</u>, 434 Fed.Appx. 22, 23-24 (2d Cir. 2011).

1.   Collateral Estoppel

As a threshold matter, Defendants first argue that McMillan's guilty plea to assault and

resisting arrest collaterally estops her from claiming "that she did not resist arrest, either before

or after she and the officers fell to the ground and that she did not assault and injure

Bhuvaneshway."  (Defs' Mem. at 6.)  Defendants contend that McMillan now seeks to

"manufacture a dispute of fact in order to survive summary judgment" by claiming that she did

not commit the acts to which she pleaded guilty.  (Defs' Reply Mem. at 4.)  Notwithstanding her

guilty plea, McMillan argues that she is "not precluded from litigating the issue of whether the

defendant officer[s] engaged in the unlawful practice of excessive force."  (Pl's Mem. at 17.)

Defendants respond that McMillan misapprehends their collateral estoppel argument and suggest

that her allegations in this case are effectively at odds with her criminal plea.

12

Under New York law,[13] collateral estoppel, or issue preclusion, "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the tribunals or causes of action are the same." Ryan v. New York Tel. Co., 62 N.Y.2d 494, 500 (1984). The doctrine applies "if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." Parker v. Blauvelt Volunteer Fire Co., 93 N.Y.2d 343, 349 (1999).

There is "no inherent conflict between a conviction for resisting arrest . . . and a finding that police officers used excessive force in effectuating [that] arrest." Sullivan, 225 F.3d at 165 (stating that "the fact that a person whom a police officer attempts to arrest resists . . . no doubt justifies the officer's use of some degree of force, but it does not give the officer license to use force without limit"). As a result, a state court conviction "for resisting arrest and/or other offenses such as assault on a police officer does not necessarily preclude a subsequent claim of excessive force in federal court." Id. An excessive force claim "would not be precluded by the plaintiff's prior convictions for resisting arrest and harassment *unless facts actually determined* in his criminal conviction that were necessary to the judgment of conviction are incompatible with the claim of excessive force being raised in the subsequent civil suit." Id. at 166 (emphasis added).

The record of the underlying criminal proceeding given to this Court is insufficient to determine whether the issues McMillan now raises were litigated before the criminal court. The charging document filed by Officer Szabranska in Criminal Court, Queens County describes

---

[13] As the prior judgment was rendered in New York, the Court must apply New York rules of collateral estoppel. See Leather v. Eyck, 180 F.3d 420, 424 (2d Cir.1999).

McMillan's resistance during the arrest but not her behavior or that of the officers before the officers subdued her.  (See Gertzer Decl., Ex. R at NYC 126.)[14]  Her plea in New York State Supreme Court, Queens County is no more detailed.  After requiring McMillan to complete a 24-week program of either anger management or alcohol treatment, the court had the following colloquy with McMillan:

> THE COURT:  Is it true . . . that you, in the course of being placed under arrest, struggled with the officers, fell to the ground and resisted arrest?  Is that true?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Is it further true that on March 18, 2007 at an address in Queens, that in the course of resisting arrest that you caused injury to Police Officer [Bhuvaneshway]?  Is that true?  That you caused injury?
>
> THE DEFENDANT:  Yes. . . .  When I resisted arrest and fell to the ground another officer was injured."

(Gertzer Decl., Ex. L, at 7:3-20.)  The plea colloquy does not discuss what events happened immediately prior to McMillan's arrest; rather, it addresses only her conduct "in the course of being placed under arrest."  (Id.)

Defendants seek to distinguish McMillan's allegations that the police "plucked [her] from her apartment, dragged her into the hall, and beat her senseless" from her claim that the officers used excessive force while effecting her arrest.  (Defs' Reply Mem. at 4.)  To the extent that Defendants' collateral estoppel argument rests on a timing distinction of who was the first aggressor or when McMillan's resistance began, there are not enough facts in the record of the prior proceeding for this Court to make that distinction.  Defendants have not met their burden to

---

[14] The charging document states that McMillan "flailed her arms and kicked [her] legs preventing the officers from placing handcuffs on her"; that McMillan "bit [Officer Chierico's] hand causing a laceration and bleeding; and that McMillan's kicking "caus[ed] Police Officer Lepore substantial pain to his wrist and caus[ed] Police Officer Bhuvaneshway substantial pain to his knee and wrist."  (Gertzer Decl., Ex. R at NYC 126.)

show that the issue of the Officers' conduct was litigated in the criminal proceeding and necessary to the judgment of conviction for resisting arrest.  Collateral estoppel is not an available defense here.

### 2.  Judicial Estoppel

Even if collateral estoppel is unavailable, the Court may still preclude McMillan's version of events under the doctrine of judicial estoppel.  Judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding."  Bates v. Long Island R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993).  The purposes of the doctrine are "to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions" and "to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings."  Id. at 1038.

Judicial estoppel may be invoked where "(1) a party's later position is 'clearly inconsistent' with its earlier position; (2) the party's former position has been adopted in some way by the court in the earlier proceeding; and (3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel."  DeRosa v. National Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (quoting New Hampshire v. Maine, 532 U.S. 742, 749 (2001).  The Second Circuit further limits judicial estoppel "to situations where the risk of inconsistent results with its impact on judicial integrity is certain."  Id. (internal quotation omitted).  Courts may raise the issue of judicial estoppel *sua sponte* "because judicial estoppel concerns the integrity of the judicial system independent of the interests of the parties."  Intellivision v. Microsoft Corp., 784 F. Supp. 2d 356, 363 n.3 (S.D.N.Y. 2011).

15

Two decisions from this court are noteworthy.  In <u>Perlleshi v. County of Westchester</u>, No. 98 Civ. 6927, 2000 WL 554294 (CM) (S.D.N.Y. Apr. 24, 2000), the court held, *sua sponte*, that the plaintiff was judicially estopped from claiming that he was "a passive victim of police violence" during a traffic stop.  <u>Id.</u> at *6.  Plaintiff testified in his deposition that the defendant police officer "punched him to the ground and hit him until he passed out" without provocation, causing him to lose consciousness.  <u>Id.</u> at *1, 6.  During his subsequent plea allocution to a charge of resisting arrest, however, he admitted that he "refused to put his hands on the car, and instead struggled with [the officer], flailing his arms, struggling violently, and eventually punching [the officer] in the mouth, which cut the officer's lip."  <u>Id.</u> at *6.  The court held that plaintiff was "judicially estopped from relying on those portions of his deposition testimony that are inconsistent with the factual statements made in his plea allocution" in order to defeat summary judgment on his § 1983 claim.  <u>Id.</u>  "Having obtained the benefit of a favorable plea by making sworn admissions in open court, he cannot now claim that the story he offered to this Court is also true."  <u>Id.</u>

In <u>Garcia</u>, defendants argued that plaintiff was judicially estopped from relying on deposition testimony that he was "a passive victim who did not resist arrest even in the face of excessive force" because it was inconsistent with his guilty plea for attempted assault of the arresting officer.  <u>Garcia</u>, 2010 WL 446446, at *5-6.  The court found that plaintiff's plea to the assault charge "inherently means that he resisted arrest," and that after accepting a favorable plea "by making sworn admissions in open court, Plaintiff cannot now also claim to be the passive victim as depicted in his deposition."  <u>Id.</u> at 6.  The court held that judicial estoppel did not completely bar plaintiff's claim for excessive force, but that plaintiff was precluded from relying on deposition testimony "in which he portrayed himself as a passive victim."  <u>Id.</u>

16

This case is no different.  McMillan pleaded guilty to resisting arrest and assaulting an officer.  She received a favorable plea deal in which the court agreed to vacate her plea for assault in the second degree, a class "D" felony, and sentence her only on a class "A" misdemeanor charge of resisting arrest if McMillan successfully completed a 24-week program of either anger management or alcohol treatment.  (Gertzer Dec. Ex. L at 3-4.)  She cannot now contend that she was a "passive victim" or that she did not resist arrest or injure officers without undermining the integrity of the criminal court proceeding.[15]  The Court will not allow McMillan to walk away from her guilty plea after she expressly waived her right to appeal that plea.  (See Gertzer Decl. Ex. L at 6, 8.)  Accordingly, McMillan is judicially estopped from asserting that she was pulled from her apartment, without provocation, and brutalized by the police.

Nevertheless, her claim is still not completely barred, because McMillan offers some evidence that the Officer Defendants used force in effecting her arrest.  See Garcia, 2010 WL 446446, at *6; see also Sullivan, 225 F.3d at 165 (state conviction for resisting arrest and assault not mutually exclusive with federal claim for excessive force).  Therefore, the Court will examine whether the use of force here was objectively reasonable in light of McMillan's conduct during the arrest.  See Garcia, 2010 WL 446446, at *6.

3.  McMillan's Excessive Force Claim

McMillan cannot establish a genuine issue of fact on her excessive force claim sufficient to defeat summary judgment for Defendants.  The force that the Officer Defendants applied to subdue McMillan and place her under arrest was objectively reasonable given the circumstances.

---

[15] Despite counsel's argument that McMillan does not contest her guilty plea, the record suggests otherwise.  When asked in her deposition whether the statements from her plea allocution were true, McMillan responded:  "No, I did not cause injury to any officers.  I did not resist arrest.  I didn't hit any officers."  (McMillan Dep. at 245:3-6.)

See Tracy, 623 F.3d at 96 (record on excessive force claims should be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

Here, Officers Chierico and Lepore responded to the scene after receiving a radio run reporting a domestic assault.  Uvino advised them that McMillan "slapped and choked" her and then punched her 8 year-old sister.  (Gertzer Decl. Ex. K.)  The officers observed bruises on Uvino and N.U.  When the officers went upstairs to speak to McMillan, they were on notice that the suspect was potentially violent and that the situation remained volatile.  Officers Chierico and Lepore both testified that McMillan attempted to flee after they identified themselves as police.  (See Lepore Dep. at 52:9-13 (stating that McMillan "charged" and "explode[d]" out of the apartment); Chierico Dep. at 42:10-11 (stating that McMillan "pretty much simultaneously . . . rushed out of the apartment").)  Officer Bhuvaneshway also testified that when he arrived on the scene, he observed McMillan attempting to run past the officers and that she ran into him. (Bhuvaneshway Dep. at 38:16-17, 39:10-11.)  When Officer Szabranska arrived, she observed McMillan "kicking, waving her hands, basically resisting arrest."  (Szabranska Dep. at 17:22-24, 20:3-4.)

Based on her guilty plea, McMillan concedes that she resisted arrest.  This justifies the Officer Defendants using some degree of force to subdue McMillan.  See Graham, 490 U.S. at 396-97.  She further concedes that in struggling to place her in handcuffs, the officers and McMillan fell to the ground.  As a result of falling face first to the floor, the medical records show that McMillan received a laceration above her eyebrow and suffered pain in her face.  That McMillan suffered minor injuries in the course of resisting arrest does not mean that the officers' use of force was objectively unreasonable.  See Johnson v. Police Officer # 17969, No. 99 Civ.

18

3964, 2000 WL 1877090, at *5 (S.D.N.Y. Dec. 27, 2000) ("[A]lthough the severity of plaintiff's alleged injuries is not dispositive, it is nonetheless highly relevant to the reasonableness of the force applied.").

Rather, the record shows that the Officer Defendants struggled to subdue a suspect who was 5'10" tall, 210 pounds, and attempting to flee.  (See Gertzer Decl., Ex. T.)[16]  After the officers partially handcuffed McMillan, she continued to flail her arms and kick her legs.  Under those circumstances, a reasonable officer would have concluded that some degree of force was necessary to subdue McMillan and place her under arrest.  That force was objectively reasonable as a matter of law.  See Graham, 490 U.S. at 396-97; Tracy, 623 F.3d at 97 (finding officer's use of flashlight to protect himself and subdue arrestee was a reasonable response where suspect "appeared to fail to comply with a direct order and instead actively resisted, thus necessitating a forceful response"); Husbands ex rel. Forde v. City of New York, 335 Fed.Appx. 124, 128 (2d Cir. 2009) (holding that officer's punch to suspect's torso in order to release suspect's hands for handcuffing was a reasonable use of force where suspect ignored command to stay still and refused to allow officer to apply handcuffs).  Her claim that the Officer Defendants kicked her and beat her in the face repeatedly has no support in the record beyond her own deposition testimony, which the Court is judicially estopped from considering.[17]  Accordingly, McMillan presents no admissible evidence from which a reasonable juror could find that the Officer

---

[16] Counsel for Plaintiff contended at oral argument that the police inaccurately recorded McMillan's height and weight in her intake records.  Follow-up medical examination records indicate that McMillan weighed 166 pounds on March 21, 2007.  (Wisham Decl. Ex. P at 3.)  For purposes of deciding Defendant's motion, however, the Court need not resolve this factual discrepancy in light of McMillan's guilty plea and her admission that she injured an officer during the struggle to place her under arrest.

[17] McMillan submits an expert report of Dr. Howard Schwartz, M.D., who concluded that McMillan's facial bruising on March 18, 2007 "was not caused by her tripping or falling to the floor," but rather by "direct blows to the head." (Declaration of Welton K. Wisham, Ex. P).  In light of the other contemporaneous evidence in the record, Dr. Schwartz's report, prepared four years after the incident, does not create an issue of fact for trial.

Defendants used excessive force in effecting McMillan's arrest on March 18, 2007. Summary judgment for Defendants is therefore appropriate.

4. Morris's Excessive Force Claim

Summary judgment is likewise appropriate for Defendants on Morris's excessive force claim. Defendants argue that any force used to remove Morris from the hallway during the ongoing efforts to place McMillan under arrest was reasonable, and that the injuries (if any) Morris purportedly sustained were de minimis. (Defs' Mem. at 12.)

Assuming Officer Szabranska applied some degree of force to Morris in order to remove her from the chaotic scene of McMillan's arrest, her actions were within the Fourth Amendment's objective reasonableness standard. Officer Szabranska testified that Morris was screaming in the hallway and generally agitating McMillan while the officers struggled to subdue McMillan. Morris concedes that she was "excited" and feared that the officers would "kill" her granddaughter. See supra n.10. Officer Szabranska estimated that she approached to within "four feet" of the Officer Defendants who were struggling to subdue McMillan in the hallway. In order to ensure the safety of everyone at the scene, it was reasonable for Officer Szabranska to remove Morris from the hallway and, if necessary, apply a reasonable amount of force to do so.

Morris presents no evidence to corroborate her deposition testimony that Officer Szabranska's actions resulted in a bruise "like the size of a 50 cents or bigger." Regardless of whether Officer Szabranska used, or even had, a police baton that night, Morris's alleged injury to her shoulder area was de minimis and cannot support a Fourth Amendment violation. The Second Circuit has held that "[A] de minimis use of force will rarely suffice to state a

20

constitutional claim."  Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993).  A plaintiff, however, "need not sustain severe injury to maintain a claim that the use of force was objectively unreasonable under the Fourth Amendment."  Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004).  But see Johnson, 2000 WL 1877090, at *5 (severity of plaintiff's injuries is "highly relevant" to whether the force used was objectively reasonable).

In Williams v. City of New York, No. 05 Civ. 10230 (SAS), 2007 WL 2214390 (S.D.N.Y. July 26, 2007), the defendant fell to the ground with an officer while resisting arrest. Id. at *2.  In order to subdue the defendant and effect the arrest, the officer sprayed the defendant's eyes with police-issued mace.  Id.  EMS subsequently flushed his eyes with saline, and the defendant suffered "only minor scrapes and bruises" from the incident.  Id.  The court held that these injuries, along with his temporary discomfort from mace, were "de minimis" and did not rise to the level of a constitutional violation as a matter of law.  Id. at *11-12.

Here, the record shows that any use of force against Morris was no more than reasonably necessary to remove her from the chaotic scene of McMillan's arrest.  The minor injury she alleges to have suffered suggests that any force used against her was objectively reasonable under the circumstances.  Summary judgment is appropriate for Defendants on her claim.

### C.  Qualified Immunity

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  In analyzing claims of qualified immunity, a court must assess:  (1) "whether the facts

that a plaintiff has . . . shown make out a violation of a constitutional right"; and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct."  Id. (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  A court may exercise its discretion and address either prong first in light of the circumstances of each case.  Id. at 236.  "A defendant is entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiff, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law." Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001).  Thus, the Officer Defendants will be immune from liability "if they can establish that it was objectively reasonable for them to believe their actions were lawful at the time."  Garcia, 2010 WL 446446, at *5.

As discussed, the record demonstrates that the Officers' use of force in subduing McMillan and in removing Morris from the scene of McMillan's arrest was objectively reasonable and did not violate the Fourth Amendment.  "[N]o rational jury could find that the force used was so excessive that no reasonable officer would have made the same choice." Garcia, 2010 WL 446446, at *8.  Accordingly, it was objectively reasonable for the Officer Defendants to believe that they were not infringing on Plaintiffs' Fourth Amendment rights.  The officers are entitled to qualified immunity and summary judgment is appropriate for Defendants on that ground.

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS summary judgment for Defendants. The

clerk of court is directed to enter judgment for Defendants and close this case.

Dated: New York, New York
       December 9, 2011

SO ORDERED

PAUL A. CROTTY
United States District Judge

23